Intellectual Ventures v. T-Mobile. Okay. Please proceed, Mr. Black. Thank you, Your Honor. May it please the Court. The District Court's grant of summary judgment rests on two issues of claim construction. The construction of application-aware resource allocator and the Court's construction of the means plus function element of Claim 20, including the term optimized, which the Court found to be indefinite. Because the District Court erred in its claim construction, the judgment should be reversed. The application-aware resource allocator is defined in the specification. I'm just trying to figure out what the issue is, really. I'm not landing anyplace. Is the difference between your view and what the District Court decided was he seemed to say there were two separate things going on. There's the application, information on the knowledge of the type of the application, and then information from the application. And he sort of seemed to say those were two different steps. Is that the dispute? I'm just trying to really understand what the dispute is here. What are the two alternative scenarios? Certainly, Your Honor. The record is quite confusing here, and I think the best way to explain it is that the way software layers work, they don't actually exist in the real world. They are an abstraction, and it's a way that computer scientists discuss software layers. So when you look on your computer and you see an image, what you're seeing is application data, which is being used to display an image. In wireless systems, there's something down at the bottom of the stack called the MAC layer, and that is responsible for sending out packets over the airwaves. It's only concerned about making sure that the packets get where they need to go. And by design, the MAC layer has no information about Layer 7. It's a bit like if you write a letter, a personal letter, and you put it in an envelope, and then you send it in, you put it in a FedEx package, and it goes to the recipient, the mailman doesn't have to know anything about the contents of the envelope. The mailman only needs to know what the routing information is on the cover. And that's a tremendous advantage, and that provides what's called layer isolation in the software world. And is that information used, is the whole purpose of that information so that the MAC layer, they can determine what bandwidth is necessary for the variety of... The MAC layer's sole job, yes, in the ordinary system, the MAC layer's sole job is to just determine how the packets get modulated and sent over the airwaves. But the MAC layer has absolutely no idea what kind of packet it's dealing with. So in the world of yesterday, the packets could have all types of different information in it, and the MAC layer doesn't know anything about it. Its sole job is to make sure that it makes no discrimination. It's not aware of what the packet contents are, and therefore it doesn't do anything special. Now what happened as voice over IP, which puts voice packets into traditional IP packets, and the Internet converged, what happened is the telecommunications industry realized that you could put both the voice packets and the Internet packets together, put them in the same pipe, and send them out over the airwaves. And that's a tremendous advantage because it allows you to stuff all these packets together and put them in the same bucket or same pipe, as they say. The problem is, voice packets have to arrive on time, every 20 milliseconds, or you're going to have poor call quality. The other 18 milliseconds, they might not be doing anything. But on the 20th millisecond, the packet has to be there. Internet packets are different. They all have to arrive, but they don't even actually have to arrive in order. They can come out of order and then be put in order at the recipient. So you have different quality of service requirements. The voice packets must arrive on time. The traditional Internet packets, not so important. So what they did, what the invention is about, is saying that the MAC layer, which normally would have no idea what kind of packet it's dealing with, the MAC layer is now aware. It's not aware in the sense of artificial intelligence. This is a construct. But it's aware at some information when it's making the decisions about what packets to send when over the airwaves. It has some information about what's happening up here at the application layer, and it can therefore discriminate among packets and make the system work efficiently. Now, the Application-Aware Resource Allocator is a tool. It's described in the first sentence of the abstract and the first sentence of the specification, and it's defined there as an Application-Aware Resource Allocator, where the resource allocator allocates bandwidth resource based on an application type. Oh, I'm sorry. What are you referring to? It's in the abstract. It's the first sentence of the abstract and the first sentence of the summary of invention. That also happens to be the claim construction that we requested. Now claim two of the patent refers to the inputs to the resource allocator. I mean, you're really dense in the technology, and it's probably helpful, but I don't actually need it right now. So isn't the real problem, the district courts, I read the district court's construction. I read your entire patent. I read his construction. I'm like, nothing wrong with it. It wasn't until I got to the motion to strike where I'm like, timeout? It has to come from Layer 7? The information has to come? It has to be taken from Layer 7? It can't be a packet header in three or four? I understand a port is not good enough. Port's not good enough. It doesn't give you enough information to identify application type, but packet headers do and can. Absolutely. So it's like it's morphed. When he articulated the construction, I don't have a problem with the words in the construction. It wasn't until he then applied it in the motion to strike where he suddenly said, oh, no, no, no, you're wrong. You have to actually take the information in order to allocate bandwidth from the 7th Layer. And that was the thing that sort of surprised me because his construction on its face didn't seem problematic. It wasn't until he effectively modified it or narrowed it in the application vis-a-vis the motion to strike. And so for me, what it came down to was, is the district court right? Because despite what he says the construction is in his application, he has clearly ruled out the possibility that the information about application type can come from Layer 3 or 4 and that that is sufficient for the QOS to then do its functionality at the MAC Layer appropriately. It doesn't have to actually pull anything from 7 itself. And so that's, it seems to me, the heart of where, if he erred, he erred, was in saying coming from 3 or 4 isn't enough. Am I right? Do I understand it right? That is correct, Your Honor. We don't believe that the words of the construction that we proposed, which we think are correct, are much different from the actual words that were used by the defendants for their construction. What was going on here, and it's a bit of a problem in the district courts now, is if an infringer wants to argue non-infringement but doesn't have a great argument based on the literal wording of the claim, of course you look to the prosecution history to see if there's some way that you can shift the prosecution history that would get them all the way to non-infringement. So they were doing what I'm going to call a... Well, not only that, I found at least three, and I'm sure more given the 80-some columns in this patent, of examples where the MAC level QOS requirements are obtained entirely from packet headers found in 3 and 4. And then what's more, the claims in this case, we're not talking about one dependent claim that would be eviscerated by this. We're talking about many, right? Let's now throw out Claim 2, Claim 11, Claim 19. All of these claims would be inappropriate under this construction. None of them would have any meaning. They would be sort of mooted entirely as though they don't exist. I agree with you completely, Your Honor. And the examiner who allowed all these claims is the same examiner that participated in this prosecution. So obviously that examiner did not have the impression that you had given away all of that, or he wouldn't have then allowed you to have all these dependent claims. That's our position. And the last page of the relevant page of the prosecution history, which is at A3500, just before the notice of allowance, has repeated references to IP packet headers, packet headers... Can I just take you back, though, to where I started, which is you were getting there, but taken quite a while, which is I'm just trying to understand. I mean, I don't want to hear global issues about district courts doing what lawyers do. I just want to know what the district court did here. And you're right. I understand. I think, one, if you could articulate, but I think I understand the difference between his original construction and the one on reconsideration. But one, articulate what the difference was. And two, tell us what led him there, which I assume is what you think is a misreading of the prosecution history. But if you could just articulate that in English, it would be helpful. Yes. I think that the resource allocator allocates the resources. That's all that Claim 1 requires. Claim 2 says, what does the resource allocator rely on? And the answer is packet headers or a direct communication from the software layer. So there's two basic types of embodiments. In one embodiment, there's a layer 7 communication all the way up here that goes all the way down to layer 2. And in the other embodiment And that direct communication between 7 and that layer was baked into his original construction, to the original construction, right? Well, baked in. It certainly was included. We don't deny that that's an embodiment. But he excluded many other embodiments of the patent, including reviewing and allocating based on the contents of packet headers at other levels. And what the patent does is it says... You're talking about the second construction. No, well, it's very hard here because he didn't give us much of an opinion on this. But the bottom line is that there are two basic ways to get the information to the resource allocator. A direct communication from layer 7 and effectively an indirect communication where the allocator infers what's happening at the application layer based on reading, say, layer 3 or 4 or other packet headers. Both of them get the information to the allocator. Both of them are covered extensively in the patent. It appears that what the district court did is limit us to the direct from layer 7 embodiment, reading out a preferred embodiment that's clearly claimed. And he did so really based solely on footnote 7 of his opinion, which is the one I referred to before. And at page A3500, it clearly states... You're taking too long to answer the Chief's question. Shouldn't it be, yeah, your best guess is he found disclaimer in the prosecution history. You don't have a lot to go on, but that's what you think he did. And here are the pages they cite and why they don't apply. So how about you take that structure? Certainly, Your Honor. The district court had a footnote, and he cited it to two office actions. He appears to have relied... The language that they asked for came out of an office action of April 2nd, 2003. And the language that they asked for says that the allocator should be able to take into account when allocating bandwidth information about applications at OSI's OSI application layer 7. And we read that and we said, okay. So you're on page 3499 and 3500 of the appendix, correct? That is correct. And at 3499, the defendant said, well, we've got to read into the claim language information about applications at layer 7. And we said, well, we don't have a problem with that. You're going to use the information about applications at layer 7. But we said it's not just directly receiving the information. The allocator has the information. Where it gets it from is relevant. On page 3500, the next page, there are repeated references to column 18, column 53, and column 63 of the patent. In fact, on page 3500, doesn't that paragraph, the relevant paragraph begin with, in the present invention? Yes. And then it goes through and talks extensively about how packet headers are one of the examples of where this exact information can come from. And aren't those packet headers contained in layer 3 and 4? Yes, Your Honor. So let me just amplify on that a bit. The key page is 3500. And it says, in the present invention, words that have hung many a patentee, but here actually explain clearly what is meant. In the present invention, scarce wireless bandwidth can be dynamically allocated using the present invention to provide, et cetera. And then if you look down a little bit further, it says differentiation, and that's differentiating between the types of packets, quote, is done on the basis of some identifiable information contained in packet content, such as, e.g., packet headers, cite to column 18 of the spec. One exemplary method includes analyzing several items in an IP packet header or payload. IP packet header or payload, that's layer 3. There's no ambiguity about it. The next thing that happened is a notice of allowance. I also want to refer to the Court's optimized construction, but I'm almost out of time. The Court should have been looking at optimization of a software application, which is something that experts understand and could have provided an infringement opinion on. The Court did not look at the specification. They simply concluded— So the optimization here is, in effect, customization based on the type of software application. There are numerous references throughout the specification about, for instance, prioritizing voice over Internet packets. That's optimizing a software for software applications in the system when the prior art was complete inability to differentiate. Thank you. May it please the Court? My name is Doug Cabale. I represent the defendants. Why don't we—I mean, he didn't spend much time on it, but why don't you start on the akin to the aesthetically pleasing language in datamized versus plumb tree, but why don't you start there? I know he didn't get to spend much time on it, but if you don't mind, start with a response to what he did say about indefiniteness. Yes, Your Honor. You're correct that this is very similar to the datamized case. It's similar to the interval licensing case. We've got a term optimized that the specification describes in terms of—the specification and the claims describe it in terms of quality of service. If we agree that this is indefinite, does that end the case, or is the claim construction issue directed to other claims? The optimized term is in claim 20, but it's not in claim 1. There is a—so we have to decide both issues? We have to decide both. Okay, so the patent tells us that this quality of service, this thing that's being optimized, is a relative term. It has different meanings to different users. It can Yes, that's column 12, line 51. Then on column 12, line 62, it explains that perhaps it's best to understand QOS as a continuum defined by what— You're going too fast. I can—column 12, line 51. Give us a page number that you're looking at. It's 13597. Thank you, Judge Prost. So we first looked at 13597, column 12, line 51. And I directed your attention to— So different users may have different definitions, that kind of thing? Yes, Your Honor. It can be understood as a continuum defined by what network performance characteristic is most important to a particular user. Where is the continuum language? Is that— That's at line 62. Yep, got it. And then column 13, right? Is that where you're going to take us to? Yeah, I was going to touch on column 14, line 39, where it explains that ultimately the end-user experience is the final arbiter of QOS. So we see that QOS is an end-user concept. Well, I thought what was pretty probative was the language in column 13. Ultimately, however, it is desirable that the QOS mechanism operate in a manner that provides the user with optimal service in whatever manner the user defines it. You're exactly right, Judge Prost. That sentence appears after the patent has explained that things change in the network. Traffic patterns change, demands of users change. And so this patent is saying that really to look at optimization, you have to look at how this user has defined what it determines to be optimal. And so this isn't—this is an end-user concept. The claim does recite end-user application IP QOS. The end-users use applications. So how do you figure out infringement? You have to survey the end-users to figure out if they were happy with it? I don't think you can determine infringement in this case, because it is subject to the vagaries of the user's subjective opinion. All right, you want to move back to the point you spent most of the time with your friend on. Tell me what in the specification supports your—and I guess ultimately the district court's final view on construction here. Sure. So, Your Honor, if I could start with figure 4 of the specification that's reproduced at page 12 of our red brief. And that shows these layers that we've been talking about. And we've talked about how the top layer, which is shown in red, is the application layer 7. This dark green middle layer is the MAC layer. That's this application-aware MAC layer in the patent. And in between is a yellow layer. That's layer 4, the transport layer. And then there's a network layer that's shaded in lighter green. So traditionally, the idea was—and I think everyone agrees—that these layers were supposed to be isolated from one another. The MAC layer was not aware of, could not communicate with, for example, the yellow layer, layer 4, the transport layer. It was not aware of, it could not communicate with the application layer 7. Well, I didn't think that this was—this invention was so much about couldn't communicate. First off, they could have easily based on technology. It was more about it wasn't the way it was done. You didn't use application information to allocate bandwidth. You know, it makes total sense, though. Application information is useful. If I'm sending a voice message, I just wanted to get there quickly. If I'm sending an Excel spreadsheet, I need it to be accurate. So I've got to differentiate in the bandwidth in terms of the type of file I'm sending because different parameters matter with regard to which type of file. That's what I thought was the crux of this invention. Am I mistaken? I thought it was using information about the application to allocate bandwidth. It's more than that. That's part of it, but there's more than that. What we see from 3499 is that there's two aspects of application aware. The first is knowledge of the application, and Judge Moore, you've pointed that out. And what the patent explains that you way to segregate different packets, to sort the packets based on their application type. Just knowing the application type doesn't tell you what are the particular IPQOS requirements that are supposed to be used for this application type, and the patent tells us where we get those. If you look at column four, lines 10 to 11, which is a reproduction of the abstract, it's also at the end of the abstract, it tells us that the priority class information comes in an application layer communication, in a communication from layer seven to the MAC layer. So it's correct that originally this claim was written... I'm sorry, I'm on column four. What line number? 10 and 11. I don't think so. Really? Just above that, it's explained that there's an application communication. It comes from the application that goes to the MAC layer. This application communication includes a priority class of the IP flow. So that's more than just knowing I know the application. There are at least two embodiments, actually there's many embodiments disclosed in this 80 plus column patent. You're telling me that I have to read into every claim, none of which currently say this, that there has to be an application communication that includes a priority class into every claim. Not one claim contains that limitation, but you're now saying I should treat this as if it says the present invention and all embodiments includes this particular transfer of information. There are two ways that you can get layer seven information. It can be a direct communication from the application, which is as described here, or the MAC layer can read the packet header in layer seven. The MAC layer can read layer seven packet headers. It can read layer four packet headers. It can read layer three packet headers. Through any of those mechanisms, it can determine the application type. That is true. But the only places that's described in this patent of actually getting the IPQOS requirements, which is beyond just the application type, is getting it from reading layer seven information. Well, that's what, okay, that seems to be what the district court concluded. I'm just, I'm not seeing where anything in the specification really supports that. Let me help you. May I respond to that, Your Honor? So what we know here is that originally at least an idea was you'd have segregation between the layers. And we know that the patent's idea was I'm going to break that model. I'm going to let the MAC layer be aware of and communicate with higher layers. And we see at column 76 of the patent, line 31, a discussion of the fact that because in this invention the MAC layer communicates with higher three, layer four, and layer seven. For that reason, it's application aware because it's communicating with layer seven. It's transport aware because it's communicating with layer four. And it's network aware because it's communicating with layer three. Those are three different things. Application aware is different than transport aware. And the patent tells us the difference is which layer are you communicating with? If you're communicating with layer four, that makes you transport aware. We see at the appendix on 3515, the applicant was facing an enablement rejection. And it said to the patent office that a person of ordinary skill in the art would understand that, quote, application aware refers to the resource allocator's knowledge of information from application layer seven. So you're saying, and this is what I'm trying, I'm just trying to understand what the district court was doing here, that there are two separate kind of boxes or inquiries for information, for application type, either go through seven directly or you can go through three, four, whatever. But for application knowledge, that's a whole different thing. And an application knowledge, it requires separate and apart from application type inquiry. Application knowledge requires direct from layer seven. I just want to know if that's what the district court was saying. Yeah, I think the district court was saying that knowledge of the application type of what kind of an application it is can come from three, four, or seven. But the second requirement, using information to allocate bandwidth coming from layer seven or using information at layer seven is a separate requirement. But see, I'm not seeing it in the spec because the spec uses information type. So, you know, the two words have come out is we say the district court had two separate boxes. One was information, it was application type, and the other was information. And I think the discussion of bandwidth starting with the first sentence of the abstract talks about application awareness where the resource allocator bandwidth resource to an application based on application type. So I think everything I read in the spec talks about allocating bandwidth in connection with application type, which is one box of the district court, right? That's the way the claim was originally written, that the application aware allocator allocated bandwidth based on application type. That claim was amended. The based on application type became part of applicant's argument about what the term application aware itself meant. And what they did is they then separately recited in the claim. Okay, so let's look at the, you're talking about the amendment that's on page 20 of your brief. It's probably most helpful if you want to see the original claim, you'd look at 3527. Okay. Okay. So on 3527, you can see that it was claimed that the application aware resource allocator allocated bandwidth resources according to the, or based on the application type. That was amended. It was amended to see what you see before you in the briefing as the claim that's being asserted. Now it says that the application aware resource allocator allocates resources based on the IPQOS requirements of the application. Just to be clear, while you say claim one was modified, why wouldn't we assume it was simply broadened as opposed to eliminating the possibility that the resource allocator can do it on application type? Sure. If you look at when the amendment was made and the arguments that were made. Yeah, but why don't you instead look at claim 10 and claim 11, which say it can be done by application type. So claim, it seems to me that claim 10 is exactly old claim one and claim 10 is dependent directly on claim one. So why in the world would I read claim one as not having been sort of broadened and still include application type when dependent claim 10 expressly says it's not on the basis of application type? Well, because the applicant has always maintained that part of the definition of application aware is using information from layer seven. Originally it tried to use, in addition to that, doing it based on the application type. I have no disagreement with you. There's absolutely embodiment in multiple places in this specification, which does use information that it obtains directly from layer seven. But there are many embodiments that use information that is obtained alternatively from layer three or four related to packet header. And that's what's claimed in all of these claims. How many claims says you can get this information on application type from either one of the following? Judge Moore, if you look at the specification and the parts that talk about using layer four or layer three information, those are talking about segregating packets. So you can use that information to determine an application type to put a packet into this bucket or to that bucket. But what I don't have yet, I don't have the IPQOS requirements that I have to use to actually do my bandwidth allocation on. The patent describes that those come from layer seven. The discussion about determining application type deals with segregating packets. How about column 22, where it is line 30, information about IP streams for use in configuring the appropriate QOS mechanism parameters can be extracted from packet headers. It then says this is the information that's used for bandwidth reservation and application switching purposes. Packet headers, that clearly tracks back to the three and four. Can I respond? Yes, of course. So just above that, it has said that you need to get the appropriate QOS mechanism parameters. You've got to focus me on them. We're claim 22, so what are you referring to where the line is? I believe the judge referred to around line 36. And I'm pointing above line 36 to say line 33. The information about the IP streams is communicated vertically in the protocol stack model from the application layer, layer seven, to the MAC layer. I'm sorry, I'm missing it. Where does it say it's for bandwidth reservation purposes? So that's not talking about layer three or four information, that's talking about using layer seven information to do your bandwidth allocation. The discussions about layer three and four are used to simply identify the application type so that you can characterize the packet and put it into one bucket or another, but you still need the second step, which is what the applicant was talking about on 3499. There's two steps. You have to figure out what the application type is. I can put it into my bucket based on that, but beyond that, you also have to use information from layer seven to do your bandwidth allocation. Okay, then why don't we turn to column 50 and show me where it says the information has to come from layer seven. Column 50, line 20. Okay. That says that many different priority classes are possible depending on the QoS requirements of the end users. So depending on the QoS requirements... And the characterization is based on packet header information to determine the QoS requirements for IP data flow. Why isn't that exactly contrary to what you're saying? The packet headers are used to characterize the packets into buckets, but what you need is the QoS requirements... No, the packet header information... Wait. The packet header information is used to determine the QoS requirements for the IP data flow. Could you give me a line on that? I'm sorry. I'm reading line 22 on column 50. It's the packet header information, that's what comes from three and four, is used to determine the QoS requirements. And the sentence starts that that happens during characterization. I don't see any pulling information... So what you're reading here is during characterization, the packet comes in and you say, what kind of packet is this? What kind of application is this? And then since it's a previously known... It's used to determine the QoS requirements. That's what we're talking about here, right? I just think there are multiple embodiments disclosed in this specification, as best as I can tell, and you convince the district court to limit them to a single embodiment. And I don't understand why, because the claims, it seemed to me, cover multiple embodiments on their face pretty clearly. I guess just closing out the column 50 discussion there, what I see is a characterization of packets. I don't necessarily... I don't see using layer three or layer four to determine the quality of service itself. So, logically, if you look at the applicant's statements in prosecution history, logically, that the applicant claimed an application-aware resource allocator that allocated based on application type, and the AMEDD reference was used to reject that. And it came back with multiple arguments, one of which was AMEDD doesn't show the application type. But a separate argument was that AMEDD doesn't show allocating bandwidth based on information that comes from layer seven. And if you look at 3518, that argument is made. They say, applicant's invention claims a resource allocator that is application-aware, i.e., it uses information about an application by looking above layer four of the OSI model. And everyone agrees here that above layer four of the OSI model in this patent is layer seven. So, the applicant is saying, application-aware, that term, i.e., means it uses information about an application. And it doesn't just use information about an application coming from anywhere. It does it in a specific way, using information about an application by looking above layer four of the OSI model. The context of why this limitation is put in makes complete sense when you look at what they were trying to get over from the prior art perspective. The prior art showed application type. There was a dispute about that, of course. But the argument was made, even if it shows application type, it doesn't show that you're using information from layer seven to make your bandwidth allocation decisions. That was made with respect to the AMEDD reference. It was made again at 3499 on the HALIAKAR reference. HALIAKAR was another reference that did its allocation based on the type of service or the type of allocation that was being analyzed. But what it didn't show was doing that based on information that came from layer seven, or information at layer seven. If you look at the applicant's language at 3499, and you consider the construction that IV is proposing here, they're saying that if you look at the applicant's language, which is where the court's construction came from, the resource allocator must be able to take into account when allocating bandwidth information about applications at OSI application layer seven. Their whole answer to this is that that's just modifying applications. It's not modifying where the information comes from. But everyone in this case agrees that all applications are at layer seven. There is no such thing as a layer three or a layer four application. So when you read the applicant's statement to say that you have not only know about the type of application, but you have to be able to take into account information about applications at layer seven, if that just simply means you just have to take into account information about applications that are at layer seven, that would make no sense. Every application is at layer seven. What the prior art didn't show was taking into account information that came from layer seven, that you either read a packet header from at layer seven, or you had a communication from the application from layer seven. That wasn't there in the prior art. They argued that multiple times to justify the meaning of application aware. The patent itself distinguishes application aware from transport aware based on where you're communicating. If it's layer four, you're transport aware. If it's layer seven, you're application aware. That's part of the ordinary meaning of application aware, always has been in this patent, and in the prosecution they stress that. Okay, we're way beyond our time. Thank you for your time. Thank you. We submit that with respect to the application aware term that the specification, the claim language, the prosecution history, including page 3500 of the appendix, all show that the applicant claimed, embraced the full scope of the application awareness, and that the information necessary can come from any source. That does not have to come directly from layer seven as the district court apparently concluded. On the optimized term, counsel pointed to column 12, which says that it is best, therefore perhaps it is best to understand QOS as a continuum defined by what network performance characteristic is most important to a particular user in the user's SLA. He didn't actually quote the user's SLA. That's a service level agreement, and one of the embodiments of the patent is a user agreeing ahead of time which types of data it wants to get priority for. So the answer to the question is can we prove infringement if that were the construction? The answer is yes. That's an embodiment in the patent. Our larger point here is that the optimized term is optimizing the end user QOS of a software application. We provided an expert declaration which discussed how QOS, that term is used by those of skill in the art, and said this was not indefinite. The district court found it indefinite without referring to the expert declaration where we believe that there are underlying issues of fact for trial. Furthermore, if you read optimize more in the context of customizing, you're customizing this system for the prioritized voice over internet packets. That is optimizing the system to those of skill in the art. That's what our expert would have testified to at trial if you were permitted to do so. Furthermore, this is a means plus function claim, and the court should have looked at the specification for the things in the specification which could be tied to the optimized term, and having done that, then we have the meets and bounds of the claim. So even if optimized generally might be too broad a term, when it's embedded in a means plus function claim like this, we looked at a specification to determine the meets and bounds of the claim as is not optional but mandatory under 112.6, and that would give us what we need. The district court did not do that analysis. He truncated the analysis, and he therefore found the claim indefinite without hearing from experts or doing a proper search of the specification. For those reasons, Your Honor, we respectfully request that the court reverse, and unless there are any further questions. Thank you. Thank you, Your Honor. The case is submitted. That concludes our proceedings for this morning.